## UNITES STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

IN RE:

ROBERTO NEGRON PEREZ           |      Case No. 03-09166 (ESL)
MARILYN NOEMI AYALA VELEZ   |      Chapter 7

DEBTORS

---

WILFREDO SEGARRA MIRANDA,
CHAPTER 7 TRUSTEE OF THE
ESTATE OF ROBERTO NEGRON
PEREZ AND MARILYN NOEMI
AYALA VELEZ

       Plaintiff                           Adv. Proc. No. 07-00240

v.

ALMACENES PITUSA, INC.;
PR RETAIL STORES, INC.; P.D.C.M.
ASSOCIATES, S.E.; ISRAEL KOPEL
AND HIS WIFE JOSEFINA
BALLESTER CABRERA AND THEIR
LEGAL CONJUGAL PARTNERSHIP;
ABC CORP. AND/OR S.E.; DEF INS.
CORP.; GHI INS. CORP.; JKL INS.
CORP.

       Defendants

---

## OPINION AND ORDER

The instant adversary proceeding is before the court on defendants' partial motion to dismiss the complaint in its entirety as to several defendants, and to dismiss Cause II of the complaint as to all defendants for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Bankr.P. 7012(b)(6). (Dkt. 16). Plaintiff, Wilfredo Segarra Miranda is the chapter 7 Trustee (the "Plaintiff" or "Trustee") on behalf of the estate of debtors, Roberto Negron Perez and Marilyn

Ayala. ("Debtors") The defendants are Almacenes Pitusa, Inc. ("Pitusa"), Israel Kopel ("Kopel") and his wife, Josefina Ballester Cabrera ("Mrs. Kopel") and their conjugal partnership (together, the "Kopels"), PDCM Associates, S.E. ("PDCM"), P.R. Retail Stores, Inc. ("PR Retail") and certain unnamed insurance companies (separate from Pitusa, the "non-Pitusa Defendants") (and jointly with Pitusa, the "Defendants"). The Motion to dismiss is based on: 1) lack of privity of contract between the Debtors and the Kopels and PDCM; and 2) lack of standing by the Trustee to bring Cause II for breach of contract. For the reasons discussed below, the Motion, as prayed for, is denied.

***Procedural background***

The Trustee filed the complaint on July 12, 2007. (Dkt. 1).[1] Defendants filed the partial motion to dismiss on September 14, 2007. (Dkt. 16) (the "Motion"). The Trustee opposed the Motion (Dkt. 19) ("Plaintiff's Opposition"), and Defendants filed a reply in support. (Dkt. 22) ("Defendants' Reply"). The Trustee filed a sur-reply in opposition to the Motion on December 19, 2007. (Dkt. 25) ("Plaintiff's Sur-reply"). The Defendants argue that the claims in the complaint are contractual in nature; and deny that the second cause of action (for breach of contract and damages) is a core proceeding and, if not dismissed, they do not consent to a final determination of the claim by this court. (Dkt. 16 at 4).

***The complaint***

This action was filed on July 12, 2007. For purposes of deciding this Motion, the Defendants concede that the properly pleaded facts and allegations in the complaint are treated as true.[2] (Dkt. 16 at 6). The Debtors had filed for chapter 11 relief on January 4, 2001, but the case was dismissed in August 2003. (See Case No. 01-00168 (ESL)). Shortly thereafter, on August 25, 2003, the Debtors

---

[1] References to matters of record will be to "Dkt. __".

[2] Defendants do not consent to core proceeding jurisdiction over Cause II. (Dkt. 16 at 4). However, for the reasons discussed below, the court finds that the action is core.

filed the instant petition under chapter 11 of the Bankruptcy Code. (the "Code") (Case No. 03-09166 (ESL)). In both bankruptcy cases, Debtors were relying on the rental income from the Property (among other revenues) at issue in this proceeding to confirm and consummate a plan.

There are two types of claims of property of the estate at issue in this adversary proceeding. The first type is the unpaid rent sought in Cause I. The second type is the damages claimed in Cause II related to a two story commercial building located in the town of Adjuntas, P.R., known in this case as the "Yumuri Building". The Yumuri Building was built on a two cuerdas tract of land that belonged to Debtors. (hereinafter, the "Property") A substantial part of the Property was leased to Pitusa with court approval (Case No. 01-00168) starting in November 2001. (the "Lease"). In June 2002, the Lease was amended to include additional space. (the "Amendment") Debtors' case was converted to chapter 7 on February 14, 2006.

The Defendants are a group of purportedly related business entities and individuals doing business in Puerto Rico. The Kopels are the sole shareholders of Pitusa and PR Retail; Kopel is Pitusa's president and is the majority Administrative Partner of PDCM. In November 2006, the Trustee sold the Property to PDCM for $1.75 million as part of Debtors' chapter 7 liquidation.

The claims in the complaint arise from the alleged breach of a lease agreement signed by Debtors and Pitusa and sets forth the following causes of action: (Cause I) the collection of unpaid rents owed by Pitusa under the lease; (Cause II) damages for breach of contract: expected rents and difference in property value, and; (Cause III) reimbursement of costs, expenses and attorney's fees incurred to enforce the terms of the lease. The claims against the non-Pitusa Defendants are couched in terms of *alter ego* theories of liability. (Dkt. 1).

According to the complaint, on November 16, 2001 Debtors leased space to Pitusa in the Yumuri Building. The Lease was for approximately 25,464 square feet of space in the Property, at

the rate of $6 dollars per square foot. Pursuant to the terms of the Lease, Pitusa had an obligation to pay rent at the rate of $12,732 per month, starting in February 2002. At all relevant times Pitusa only paid $12,500 per month, thus accumulating $232 dollars per month in partial unpaid arrears throughout the term of the Lease until the Property was sold in November 2006. Thus, the $13,238 dollars claimed in the first count of Cause I were accumulated from about February 2002 through November 2006.

On June 28, 2002 the parties executed an Amendment to the Lease whereby Pitusa leased three additional spaces which added approximately 12,400 square feet to the Lease, at the same rental rate. Under the Amendment, Pitusa was liable to Debtors for an extra $6,199 per month in rent payments. (Dkt. 1 ¶¶ 26, 27). According to the complaint, Pitusa's obligation to pay rent under the Amendment began at the earlier of 90 days after executing the Amendment, or when Pitusa opened for business, whichever occurred first. Pitusa also had a right to off-set from the rent payment up to 50% of the costs of improvements, subject to approval by Debtors of the construction plans. Pitusa never exercised its off-set option. Likewise, Pitusa did not pay any rent for the additional space leased under the Amendment.[3] Plaintiff's second damage claim in Cause I of the complaint is for $223,198, equal to thirty-six months of rent due under the Amendment. Thus, the inference from the complaint is that Pitusa's rent obligation under the Amendment started in November 2003, the date in which Pitusa opened for business, and accrued until the sale of the Property in November 2006.

The complaint (Dkt. 1 at 8-9) states that by 2003, the Debtors added fifteen new rental spaces to the Property which would be leased at the rate of $650 dollars per month per space (or the expectation of a maximum of $9,750 per month). The response to the new spaces was "extremely

---

[3] The additional space under the Amendment was designated as spaces B, C and D. Originally, space D was to remain available to Debtors to lease to third parties. However, Pitusa took possession of space D and used the space at all times, thus the Trustee claims Pitusa is liable for the rents corresponding to that space.

- 4 -

positive" and soon eleven of the fifteen spaces were leased under five separate lease agreements with entities other than Pitusa. (the "non-Pitusa leases" or "tenants"). However, shortly thereafter, the new spaces began experiencing "critical" condensation problems described as "rain" dripping from the ceiling that affected the non-Pitusa tenants' use of the Property. Pitusa hired an engineer to study the problem in February 2004. The engineer reported his findings in a written report given to Pitusa in March 2004. After extensive negotiations, Pitusa gave Debtors a copy of the report in "late" 2004. The report identified the source of the condensation and dripping problem to be coming from the cooling system (or "freezers") installed on the second floor of the Property leased by Pitusa. According to the report, the freezers for Pitusa's supermarket were installed without first covering the floor with insulation. (See report at Case No. 03-09166, Dkt. 119 at Exh. A). The freezers kept the floor surface cold. The floor where Pitusa's freezers sat was also the ceiling for the lower-level spaces rented to the non-Pitusa tenants. The hot air generated by the business operations of non-Pitusa tenants reacted with the cold surface above and condensed, causing a constant "rain" in the lower level of the Property. The report made several recommendations to repair the condensation problem and favored one that would cost approximately $44,000 to implement. It appears that Pitusa never fixed the problem while Debtors still owned the Property.

As a result of this "rain" and Pitusa's failure to repair the problem, Debtors lost the new non-Pitusa tenants and could not rent the new spaces. (Dkt 1 ¶ 39). Cause II of the complaint seeks $351,000 in damages for this claim, which adds up to thirty-six months of lost rent from the non-Pitusa leases (36 x 9,750). Thus, the loss of the non-Pitusa tenants should cover the period from November 2003, when Pitusa opened for business, to November 2006 when the Property was sold to PDCM.

The second count in Cause II is for approximately $1.7 million dollars–the difference

- 5 -

between the sales price of the Property, $1.75 million, and its appraised value of $3.4 million.

Under the Lease, Pitusa could make any improvements to the Property that did not reduce or affect its commercial value; Pitusa could not conduct any activity that could affect the rights of other tenants to the peaceful enjoyment of their respective premises; and Pitusa would reimburse Debtors for the legal costs and expenses, including attorney's fees, incurred by the Debtors in enforcing Pitusa's obligations under the Lease. (Dkt. 1 at 4-5).

The complaint alleges that the Defendants "decided to take advantage of the situation" that Debtors were in chapter 11 due to financial difficulties. (Dkt. 1 ¶ 45). Defendants began designing and implementing a plan or conspiracy to "strangle" the Debtors financially and impair the viability of Debtors' chapter 11 plan and concomitant rehabilitation, and otherwise defraud the Debtors. The reduced rental income from the Property due to Pitusa's incomplete payments and damage to the Property, alleged as part of Defendants' wrongful acts, impeded Debtors from complying with a reorganization plan, caused Debtors' case to be converted to chapter 7 liquidation in February 2006 and forced the sale of the Property to Defendants for half of its appraised value.

From the facts and allegations in the complaint and Plaintiff's other briefs in support of his claims, we glean that the Defendants' fraudulent or tortious objective was to obtain a benefit by avoiding payment of the full rent owed by Pitusa and by acquiring Debtor's Property on the cheap. Apparently, the Defendants' acts diminished the value of the Property compared to its appraisal value, which the Defendants then acquired in the bankruptcy proceeding. The Trustee claims that the actions executed by the Defendants against the Debtors were masterminded by Kopel, and executed by, or through, his direct participation in or instructions to his co-Defendants. As evidence of the plan or conspiracy, the Trustee claims that he "had" to sell the Property to PDCM, an entity allegedly related to Pitusa and owned and controlled by Kopel, for a mere $1,750,000 in November

- 6 -

2006; whereas the Property was appraised at more than $3.4 million over three years before the sale. The reason was that no one offered more than $1.7 million due to the inadequate rental income and the damage to the lower level of the Property allegedly caused by Pitusa's freezers and its failure to repair the problem. (Dkt. 1 at 7, 9-10). Pitusa's failure to pay the full rent due, and to repair the water damage caused by its freezers, constitute the underlying breach of the Lease agreement.

The complaint (Dkt. 1 at 7) also raises the inference that there was a fraudulent plan to strip Pitusa of its valuable assets, perhaps so that it could not face its obligations under the Lease. In that regard, the Trustee alleges that in September 2003, citing an alleged "corporate reorganization", "Pitusa" gave notice that it "would" assign the Lease to PR Retail, an entity purportedly owned by Kopel and affiliated with Pitusa. According to records in the Commonwealth of Puerto Rico Department of State, PR Retail was (or is) a non-existent entity. The notice of assignment to PR Retail came with reassurances that Kopel "owned 100% of the shares" of PR Retail and that Pitusa would remain liable for the obligations under the Lease.

The Trustee claims that Kopel should be held personally liable for the damages to the Property. The basis for Kopel's personal liability is that he acted as a control figure and/or that the Defendants are in fact Kopel's *alter egos* or business conduits, and the proceeds of their illegal and wrongful acts against the Debtors accrued to Kopel's exclusive and personal benefit. In the alternative, Plaintiff claims that Kopel and the other Defendants are part of a conspiracy to defraud Debtors and are liable for those acts. (Dkt. 1 at 10-11). The Trustee is essentially asking the court to pierce the Defendants' corporate veil in order to assign liability to all Defendants, especially Kopel.

***Standard for Rule 12(b)(6) Motion to Dismiss***

When considering a motion to dismiss, "(1) the complaint is construed in the light most

- 7 -

favorable to the Plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader." *In re Conley*, 369 B.R. 67, 72 (1st Cir. BAP 2007) *citing* 5B Wright & Miller, Federal Practice and Procedure: Civil 3d § 1357 at 417; *Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 51 (1st Cir. 1990). The test set forth in the leading case of *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957) was "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See also In re Diamond*, 346 F.3d 224 (1st Cir. 2003). However, as recently stated by the U.S. Supreme Court, the oft quoted "no set of facts" passage in *Conley* "has earned its retirement" after puzzling the legal profession for 50 years. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. __, 127 S.Ct. 1955, 1969 (2007). The reason is that, taken literally, under the "no set of facts" standard "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of undisclosed facts" to support recovery. [...] It seems fair to say that this approach to pleading would dispense with any showing of a "reasonably founded hope" that a plaintiff would be able to make a case [because a plaintiff's] optimism would be enough. *Id*. at 1968-69 (citations omitted).

The *Twonbly* Court enunciated this new standard ever mindful of the simple "notice" pleading requirements embodied in Rule 8. The *Twombly* standard does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. [If Plaintiffs fail to nudge] their claims across the line from conceivable to plausible, their complaint must be dismissed." 127 S.Ct. at 1974. In that regard, "[b]ecause a dismissal terminates an action at the earliest stages of the litigation, without a developed factual basis for decision, the court must carefully balance the rule of simplified civil pleading against the need for something more than

- 8 -

conclusory allegations. *Washington Legal Found v. Massachusetts Bar Found*, 993 F.2d 962, 971 (1st Cir. 1993). However, the court will not accept unsupported conclusions or interpretations of the law. *Id.*

### *Piercing the corporate veil under Puerto Rico law*

To impose liability on the non-Pitusa Defendants for the tortious or fraudulent conduct alleged in the complaint, the Plaintiff will need to pierce the Defendants' corporate veil in order to establish the necessary causal nexus between their acts, and the damages. "The doctrine of piercing the corporate veil is equitable in nature. [D]isregard of the corporate entity may be refused where the court determines that the complaining party can be adequately compensated with money damages." William Meade Fletcher, 1 *Fletcher Cyc. Corp.* § 41.25 (Thompson/West 2008). Also, "where no fraud is shown, a plaintiff must show that an inequitable result involving fundamental unfairness would result... [A]lthough corporate existence can be disregarded without a specific showing of fraud, it is necessary to show that an injustice would result if the corporate form were left intact." *Id.*

Under Puerto Rico law, corporations are presumed to be "separate from its stockholders, directors, officers, employees and/or any controlling entity." *Colon v. Rinaldi, MD, et al*, 2006 WL 3421862, *6 (D.P.R. 2006) (unreported opinion). However, claims for piercing the corporate veil are actionable in Puerto Rico. The plaintiff must show that piercing the corporate veil is necessary, proper or justified in order to proceed. *Id.* The burden is on the party seeking to pierce the corporate veil. Absent proof of fraud or substantial injustice, the standard to pierce the corporate veil is by "strong and robust evidence". *San Miguel Fertil. Corp. v. P.R. Drydock*, 94 P.R.Dec. 424, 430 (1967). The corporate fiction will be disregarded and liability will be imposed upon related corporate entities upon a showing of "strong and robust evidence showing the parent corporation to have that

degree of control over the subsidiary as to render the latter a mere shell for the former." *Milan v. Centennial Comm. Corp.*, 500 F.Supp.2d 14, 26 (D.P.R. 2007) (citing *Fleming v. Toa Alta Development Corp.*, 96 P.R.Dec. 240 (1968)). The corporate veil may be pierced if a company "is being used to sanction fraud, evade obligations, defeat public policy, justify inequity, protect fraud or defend crime." *Milan,* 500 F.Supp.2d at 26. The facts or evidence must show that the entities allegedly involved in the fraudulent or inequitable conduct "acted as a single business enterprise under Puerto Rico law." *Id.* at 27.

***Discussion***

The Motion presents two basic legal issues. The first issue is whether the entire complaint should be dismissed for failure to establish "any contractual connection" between Debtors, PDCM and the Kopels. (Dkt. 16 at 7) ("privity of contract"). The second issue is whether Cause II for breach of contract should be dismissed as to all Defendants because the Trustee lacks standing to bring this claim. The court finds that Defendants fail in both.

The complaint sets forth contract, tort and fraud theories of recovery which may be actionable against the non-Pitusa Defendants by piercing the corporate veil of the Defendants' business group. These legal theories do not require privity of contract to exist among all parties for Plaintiff's claims to be actionable. Furthermore and despite its label, Cause II can fairly be interpreted to plead a post-petition claim in the nature of a tort to property of the estate derived from, but not necessarily based on, the Lease between Debtors and Pitusa. As such, the claims belong to the estate and the Trustee is the party with standing to bring these post-petition claims on behalf of the chapter 7 estate.

***Privity of Contract***

The first part of the Motion presents a discrete legal issue, that is, lack of privity of contract as the basis to dismiss the complaint. The Kopels and PDCM claim that the complaint should be

- 10 -

dismissed as to them because they were not in privity of contract with the Debtors. The Motion and Defendant's Reply do not attack the sufficiency of the pleadings in terms of the facts and allegations supporting the fraud, conspiracy and corporate veil piercing (*alter ego*) theories of recovery underlying the complaint.[4]

Privity of contract among or between the parties to the action is not a requisite element for what are essentially tort claims against third parties to a contract. Plaintiff claims that the Defendants acted in concert with Pitusa to cause the damages complained of, or were Kopel's *alter egos* or business conduits used to perpetrate the fraudulent or tortious acts that caused Pitusa's default and the damages to the estate, and therefore are all liable in damages to Plaintiff. (Dkt. 1). Consequently, privity of contract between Debtors and the Kopels and PDCM is not the issue. The issue is whether the complaint establishes a causal nexus between the alleged conduct of the actors that may have caused the damages complained of. That nexus between the damages and the conduct imputed to the non-Pitusa Defendants may be established by piercing the Defendants' corporate veil.

### *Lack of Standing*

The Motion seeks to dismiss Cause II of the complaint as to all Defendants for lack of standing of the Trustee to bring this claim. This defense is groundless. The damage claims in Cause II are alleged to be the consequence of Pitusa's post-petition failure to repair the water damage to the Property pursuant to its obligations under the Lease, which constitutes a breach of contract. The breach is alleged to have been induced or caused by the acts of the non-Pitusa Defendants or as a result of a conspiracy between all Defendants.

The filing of a petition under title 11 creates an estate. 11 U.S.C. § 541(a). Pursuant to §

---

[4] The Defendants' Reply takes issue with the fraud allegations in the complaint. (Dkt. 22). However, Defendants' Reply merely recites the basic elements for pleading fraud in this district and the evidentiary standard under local law. (Dkt. 22 a 3-4). Otherwise, Defendants' Reply supports the Motion as originally prayed for, that is, lack of privity of contract and lack of standing.

541(a)(1) the estate is comprised of all of debtor's legal or equitable interests in property as of the commencement of the case. The Lease contract authorized by the court in the 2001 case is property of the estate as of the commencement of the 2003 case. The Property (its commercial and monetary value) is also property of the estate as of the commencement of the case, and the leases to the non-Pitusa tenants were post-petition assets acquired by the estate during the 2003 case.

The weight of authority supports the conclusion that claims and causes of action arising from the post-petition breach of a contract with a debtor, or for post-petition torts committed against property of the estate, including alleged frauds committed during or as a consequence of the sale of property of the estate, are interests of the estate under section 541(a)(6) "proceeds, products or profits". *See, In re Stephen Grosse P.S.*, 44 B.R. 200 (Bkrtcy.D.Pa. 1984) (claim for difference in value of property of the estate tortiously and fraudulently converted by defendants was core proceeding; the claim was a post-petition "product" of the estate within the meaning of § 541(a)(6)); *In re Acton Foodservices Corp.*, 39 B.R. 70, 72 (Bkrtcy.D.Mass. 1984) (post-petition fraud claims are section 541(a)(6) & (7) property of chapter 7 estate which may only be pursued by chapter 7 trustee). The claims in Cause II can also be categorized as after-acquired property of the estate under section 541(a)(7) of the Code. *Id.* Under section 541(a)(7), contracts such as the Lease with Pitusa and the leases with non-Pitusa tenants became property acquired by the chapter 11 estate after the commencement of the case. 9A Am. Jur. 2d *Bankruptcy* § 1280 (Thompson/West 2008). Therefore the post-petition claims in the complaint are after-acquired proceeds or products of the estate pursuant to section 541(a)(6). *Id.* "Where a case is converted from Chapter 11 to Chapter 7, the Chapter 7 estate [...] include[s] property which was acquired by the Chapter 11 estate after the filing of the Chapter 11 case." 8A C.J.S. *Bankruptcy* § 563 (Thompson/West 2008) citing *In re Acton Foodservices Corp.* 39 B.R. 70.

- 12 -

Thus, under a combined reading of sections 541, 323 and Bankruptcy Rule 6009, "the trustee may, in [the] exercise of his sound judgment and discretion, attempt to reduce to judgment causes of action which are property of debtor's estate[.]" 2 Bankr. Service L. Ed. § 15:61 (Thompson/West 2008).

The Trustee asserts that he did not abandon or waive any of the causes of action stated in the complaint. In approving the sale of the Property, the court did not order the Trustee to abandon or waive any claims of the estate connected to the Lease or the Property. (Dkt. 25 at 6-7). "Property is deemed abandoned if the trustee affirmatively abandons it..." *In re Conroy*, 2006 WL 1005065, *3 (Bkrtcy.N.D.Ill. 2006) (citing § 544; dismissing counter-claim asserted by debtor against a creditor holding that the chapter 7 trustee was the proper party with standing to pursue the counter-claim for breach of contract); *see also* Bankruptcy Rule 6007 (unless the court orders otherwise, abandonment of property of the estate requires notice and a hearing). Therefore, the Trustee "stands in the shoes of the debtor" for purposes of pursing these claims on behalf of the estate. 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 323.03[2] (15th Ed. 2007). Furthermore, "[t]he trustee, as representative of the estate, has the exclusive capacity to sue and be sued on behalf of the estate[.]" *Id.* at ¶ 323.03

For the foregoing reasons, the chapter 7 Trustee has standing to pursue the claims in Cause II and the part of the Motion to dismiss Cause II as to all Defendants for lack of standing is denied.

### *Core Proceeding jurisdiction*

The Defendants claim that Cause II is not a core proceeding and they do not consent to a final determination of said cause of action by this court. The nature and origin of the damage claims in Cause II has been discussed above.

Bankruptcy courts have core jurisdiction over proceedings "arising under" title 11 and proceedings "arising in" a case under title 11. If the nature of the proceeding is one that could only

- 13 -

arise within the bankruptcy context because it involves a right created by federal bankruptcy law, then it is a core proceeding. A proceeding "arises under" title 11 if the action is based on the provisions of the Code. However, the determination of whether a controversy is core or non-core is a function of the bankruptcy judge which does not depend on the federal or state basis for the claim. If an action would survive outside of bankruptcy and in the absence of bankruptcy would have been initiated in a state or a district court, then it involves a non-core matter. *See, e.g., In re Arnold Print Works, Inc.*, 815 F.2d 165, 168-71 (1st Cir. 1987); *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987); *In re Mec Steel Bldgs., Inc.*, 136 B.R. 606, 608-09 (Bkrtcy.D.P.R. 1992).

Based on the foregoing, this action "arises in" a case under title 11 and the court has core proceeding jurisdiction under section 28 U.S.C. § 157(b)(2)(A), (M) and/or (O). *See, e.g., In re Arnold Print*, 815 F.2d at 168 (action by debtor to recover post-petition account receivable is a core proceeding arising in a case under title 11 and concerning the administration of the estate, § 157(b)(2)(A), and affecting the liquidation of estate assets, § 157(b)(2)(O)); *Matter of O'Sullivan's Fuel Oil Co., Inc.*, 88 B.R. 17 (D.Conn 1988) (favorably discussing the *Arnold Print* case and holding that an action predominantly asserting post-petition torts and claims for tortious interference with business opportunities "arises in" a case under title 11 and is a core proceeding under § 157(b)(2) which chapter 7 trustee alone can bring).[5] *In re Nutri/System, Inc.*, 159 B.R. 725, 727 (E.D.Pa. 1993) (action for post-petition breach and tortious interference with contract is "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (relating to matters concerning the administration of the estate), (M) (relating to orders approving the use of property of the bankruptcy estate) and (O)

---

[5] The fact that a portion of Plaintiff's rent claims in Count I of the complaint are pre-petition claims does not warrant a finding that this proceeding is non-core. "When the postpetition acts complained of heavily dominate [when] compared to the prepetition acts, a proceeding brought to attach liability based upon the totality of such acts will be considered a core matter." *O'Sullivan's Fuel*, 88 B.R. at 20-21. Furthermore, Defendants have not raised any "core" objections to Causes I and III, and their core objection as to Count II is misplaced.

(relating to proceedings affecting liquidation of the assets of the bankruptcy estate)).

***Conclusion***

The Motion is hereby denied. Privity of contract is not required when claiming in tort against non-parties to a contractual relationship. Furthermore, the claims asserted in the complaint are property of the estate pursuant to section 541. The bulk of the damages complained of took place post-petition, and the tortious acts complained of were directed at property of the estate created by virtue of the Code upon the filing of the petition. Pursuant to section 157(b) and applicable case law, this action is a core proceeding "arising in" a case under title 11. Finally, it is hornbook law that the trustee in bankruptcy, particularly a chapter 7 trustee, has standing to sue and be sued on behalf of debtors and their estates.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 28th day of April, 2008.

_____
ENRIQUE S. LAMOUTTE
U.S. Bankruptcy Judge

- 15 -